# AFFIDAVIT

I, Bret L. Earls, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic device and removable media listed in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. There is probable cause to believe that a search of the device will lead to evidence of violations under 21 U.S.C. § 846 and 841, Conspiracy to Possess and Possession with Intent to Distribute Controlled Substances.

3. The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed; or have been told to me directly by other members of the investigative team, which includes federal Custom and Border Protection (CBP) law enforcement officers with whom I have worked on this investigation. As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of an Order for the examination of the device.

4. I am employed by the Department of Homeland Security (DHS), Customs and Border Protection (CBP), currently assigned to Homeland Security Investigations (HSI) as a Task Force Officer (TFO). I have been employed as a TFO since December 2021, assigned to the Assistant Special Agent in Charge (ASAC), Nogales, Arizona office. I am empowered by law within the meaning of Section 2510 (7) of Title 18, United States Code to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am a U.S. Customs and Border Protection Officer (CBPO) within the meaning of Title 19, and Title 21 United States Code, Section 1401(i) and authorized to conduct investigations under Titles 18, 19, and 21 of the United States Code under Chapter 27 (Customs) of the United States Code. Unless otherwise stated, or the context so requires, this affidavit refers to me when it says "I," "me," or "Your Affiant."

5. Outside my current detail with HSI, I am a US Customs and Border Protection Officer (CBPO) assigned to the Nogales Ports of Entry (POE) since 2017. Previously to working in Nogales, I was assigned to the San Ysidro Port of Entry (POE), located in San Diego, CA., for approximately four (4) years. From 1990 to 2000 I served as a Police Officer in the States of Virginia, Michigan, and Arizona. Additional positions I have served are both as a Precinct Detective and as a Helicopter Co-pilot in an Air Unit. I

graduated from the basic Federal Law Enforcement Training (FLETC) Center, Glynco, GA., in 2013.

6. Through my training and experience, I have worked numerous investigations and or assisted multiple Law Enforcement Agencies and Special Agents within Homeland Security Investigations (HSI) throughout my career. I have assisted with search warrants involving controlled substances, contraband smuggling, operations of drug trafficking organizations (DTOs), concealment method techniques used by individuals and by vehicles, interdiction operations, surveillance techniques, report writing, confidential source management, and training regarding the interception of wire, oral, and electronic communications, among others.

7. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and structure of contraband smuggling organizations (DTO's).

8. My responsibilities include, conducting investigations into DTOs and individuals who derive substantial income from the illicit movement and distribution of narcotics, firearms, ammunition, and funds over ten-thousand ($10,000) dollars.

9. As a TFO with HSI, I am responsible for the investigation of enforcing violations of Federal law to include the enforcement of various Federal Customs and Immigration Laws.

10. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, internet, social media and slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities to mislead law enforcement investigations.

11. Through training and experience I know the following:

    a) Contraband smugglers involved in the illicit movement of narcotics, firearms, ammunition, or large funds over ten-thousand dollars ($10,000) often purchase and or title their assets in fictitious names, aliases or in the names of relatives, associates, and business entities to avoid detection of these assets by governmental agencies.

    b) That even though these assets are in names of others than the smugglers, the smugglers actually own and continue to use these assets and exercise dominion and control over them.

    c) Contraband smugglers also maintain books, records, receipts, notes, ledgers, personal computers, cellular phones, money orders, and other papers relating to the movement and storage of narcotics, firearms, ammunition, and funds over ten-thousand dollars ($10,000).

d)      That large-scale narcotics traffickers often utilize electronic equipment such as cellular telephones, personal digital assistants (PDAs), computers, telex machines, facsimile machines, and telephone answering machines to generate, transfer, count, record, and or store their information described in items a, b, and c.

e)   That narcotics smugglers commonly use cellular telephones to communicate with their associates and to facilitate movement and housing of narcotics, firearms, ammunition, and funds over ten-thousand dollars ($10,000). These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the narcotics trafficking associates and or activity, all of which can be used to identify and locate associates, to identify methods of operation of the traffickers, and to corroborate other evidence obtained during the course of the current investigation.

**PURPOSE OF AFFIDAVIT**

12. I believe there is probable cause that the cellular phone in the possession of Ashley HERNANDEZ-HERANDEZ, **Target Device #1** or **(TD1)**, contains evidence related to conspiracy to possess and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Sections 846 and 841.United States.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

13. The property item to be searched, **Target Device #1 (TD1)**, is a red iPhone, further described in Attachment A, and documented on DHS form 6051S as Line-item 0004 – linked to event # 2023-2604-0001530. **TD1** is currently in law enforcement custody and is being held at the HSI Nogales office located at 41 Paseo De Yucatan, Rio Rico, AZ 85648.

14. The applied-for warrant would authorize the forensic examination of **TD1** for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

15. On November 24, 2022, at approximately 1733 hours, Ashley Zuleyka HERNANDEZ-HERNANDEZ presented herself for inspection at the DeConcini Port of Entry (POE), in Nogales, in the District of Arizona.

16. HERNANDEZ was the sole occupant, operator, and registered owner of a 2012 Dodge Avenger bearing an Arizona license plate KEA76K. HERNANDEZ presented an Arizona operator's license D07013566 claiming to be a United States citizen with no other documents presented to Customs and Border Protection Officer (CBPO) Keira Denson working primary vehicle lane #4.

17. CBPO Denson asked HERNANDEZ where she was going in the United States. HERNANDEZ stated she was going to her residence in Tucson, AZ. CBPO Denson asked HERNANDEZ if the listed address on HERNANDEZ's operator's license is her current address. HERNANDEZ replied, "No, I just moved to Tucson." CBPO Denson went on to ask HERNANDEZ where in Mexico she had traveled and for how long. HERNANDEZ stated in a soft, undertone voice, that she went to a festival in Guadalajara, Mexico called, "Dream Fall", for about one week. Due to HERNANDEZ speaking in a soft quiet voice, CBPO Denson verified the time by asking HERNANDEZ, "Did you say one (1) week?" HERNANDEZ then changed her answer replying, "I actually stayed for about two (2) weeks." CBPO Denson observed that HERNANDEZ appeared nervous when answering and then observed HERNANDEZ begin to count on her fingers and that her hands begin to shake.

18. CBPO Denson went on to ask HERNANDEZ what "Dream Fall" was. HERNANDEZ stated it is a large festival in Guadalajara, Mexico put on yearly. CBPO Denson observed further indicators that HERNANDEZ was nervous as she explained the festival. HERNANDEZ appeared uncomfortable by moving around in her seat, and unsure of the answer provided to CBPO Denson on how long she stayed in Mexico. HERNANDEZ changed her answer for a third time by telling CBPO Denson she only stayed in Mexico for about eleven (11) days.

19. CBPO Denson received multiple times of how long she stayed in Mexico before obtaining a negative Customs declaration. HERNANDEZ responded by shaking her head side to side in a no motion before replying, "No." CBPO Denson then referred HERNANDEZ to the vehicle secondary inspection area for further inspection.

20. At approximately 1735 hours HERNANDEZ drove her Dodge Avenger thru the NII Z-Portal (X-Ray) scanner operated by certified NII Z-Portal operator CBPO Dominique Atkins. CBPO Atkins stated he identified anomalies in the rocker panels on both sides of the Dodge Avenger and parked the Dodge Avenger for further inspection by CBPO's.

21. At approximately 1740 hours, CBPO Molly Mcquire was working the vehicle secondary inspection area and contacted HERNANDEZ, obtaining a second negative Customs declaration for agriculture products, alcohol, tobacco, firearms, weapons, ammunition, medication, narcotics/drugs, or currency over ten thousand ($10,000) dollars. HERNANDEZ stated no to all items, except tobacco.

22. CBPO Mcquire asked HERNANDEZ what the purpose of her visit to Mexico was, HERNANDEZ stated she went to a music festival in Guadalajara, Mexico. CBPO Mcquire asked how long she visited Guadalajara, Mexico, HERNANDEZ then stated that she stayed for a few days and stayed with family members last night in Nogales Sonora, Mexico.

23. CBPO Mcquire asked HERNANDEZ, "Are you the owner of the vehicle." HERNANDEZ replied "Yes." CBPO Mcquire escorted HERNANDEZ to the secondary holding area before conducting an inspection on the Dodge Avenger. While returning to the Dodge Avenger to conduct a vehicle inspection, CBPO Atkins notified CBPO Mcquire of the anomalies discovered in the rocker panels of the Dodge Avenger. CBPO Mcquire requested a canine (K9) to search the Dodge Avenger, prior to conducting a physical inspection.

24. At approximately 1750 hours, Canine Enforcement Officer (CEO) Christian Rivas responded to the Dodge Avenger with his assigned canine (k9) "Dany" # (211200) to conduct a sniff search. CEO Rivas stated canine (k9) "Dany" alerted to a trained odor of narcotics at the driver side inner rear door seams.

25. CBPO Mcquire returned to the Dodge Avenger and noticed a strong chemical odor emitting from the rear rocker panel areas on both sides of the Dodge Avenger and observed fresh Bondo. CBPO Mcquire drove the Dodge Avenger to the lift area for further inspection and while enroute observed a GPS tracking device located under the steering column near the foot pedals. CBPO Mcquire and SCBPO Gonzalez upon further inspection of the rocker panels discovered non-factory compartments behind the rocker panels on both sides of the vehicles rear wheel well areas.

26. CBPO Mcquire and SCBPO Gonzalez then opened the non-factory compartments and removed forty-six (46) packages wrapped in tinfoil with a string attached to the packages, which were removed through the rocker panels. CBPO Mcquire opened one of the packages to reveal small blue in color pills.

27. CBPO Mcquire utilized the Rapid Response field strip to test the blue pills, resulting in a positive test for the property of fentanyl, witness by SCBPO Gonzalez. The fentanyl had a total weight of 35.86 kilograms (79.05 pounds).

28. I arrived at the POE and made contact with HERNANDEZ. After my interaction with her, I observed several missed calls and notifications on **TD1**. During the time of contact with HERNANDEZ, **TD1** was on silent mode and no calls or notifications were noticed. I observed the following missed incoming calls and notifications with no phone numbers displayed on the iPhone:

   1) **Oscar Colosio -- One (1) missed call and four (4) missed notifications.**
   2) **Hansel ------------One (1) missed call and four (4) missed notifications.**
   3) **Hector Velarde--One (1) missed call and two (2) missed notifications.**
   4) **Ruben Trejo ---- One (1) missed call.**

5) **Erika Paola** ----- **One (1) missed call.**
6) **Shein** -------------- **One (1) missed call.**
7) **Rappi** ------------ **One (1) missed call.**

Based on my training and experience, this volume of missed notifications and calls are consistent with individuals involved in the drug trafficking conspiracy trying to ascertain the driver's location, status of crossing the load vehicle into the United States, and/or attempting to make contact if they do not connect with the load driver after it enters the POE or see it successfully enter the United States.

**TECHNICAL TERMS**

29.   Based on my training and experience, I use the following technical terms to convey the following meanings:

a)   Wireless telephone:  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b)   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include distinct types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c)   Portable media player:  A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include distinct types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the

ability to store large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d)  GPS: A GPS navigation device uses the Global Positioning System (GPS) to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e)  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include distinct types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f)  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform distinct functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

   g)  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

   h)  IP Address:  An Internet Protocol (IP) address is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each

in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the target devices have capabilities that allows it to serve as a wireless telephone, receive and send email, instant messaging, a digital camera, and serve as a GPS navigation device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

32. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the target devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on the target devices:

a) on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b) Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d)  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e)  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33.  Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **TD1** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the target devices to human inspection in order to determine whether it is evidence described by the warrant.

34.  Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

35.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **TD1** as described in Attachment A to seek the items described in Attachment B.

                       Respectfully submitted,

                       BRET L EARLS *Digitally signed by BRET L EARLS*
                       *Date: 2022.12.14 10:38:43 -07'00'*

                       Bret L. Earls, Task Force Officer
                       Homeland Security Investigations

Subscribed and sworn to telephonically on this 14th day of December, 2022.

D. THOMAS FERRARO
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## (TD1) TO BE SEARCHED

22) This warrant applies the following

23) The property to be searched is documented on DHS forms 6051S as line item 0004 (Target Phone) belonging to event # (2023-2604-00015301).

1. Target Phone **(TD1)**– iPhone below:

 

## ATTACHMENT B

1. All records on **TD1** described in Attachment A that relate to the violations and suspect information set forth in the Affidavit, including:

    a. Cellular information: cellular numbers, cellular service providers, caller identifications displaying sent, received, dialed and missed calls;

    b. Text information: text messages received, sent, drafted, and deleted;

    c. Photographs: photographs taken, received, sent, saved, and deleted;

    d. Videos: videos taken, received, sent, saved, and deleted;

    e. Audio: audio taken, received, shared, sent, saved and deleted;

    f. Emails: emails sent, received, drafted, saved and deleted;

    g. Contact information: telephone contact list displaying names, addresses, telephone numbers, and deleted information;

    h. User attribution: evidence of user attribution showing who used or owned **TD1** as described in Attachment A at the time things described in this warrant were created, edited or deleted, such as logs, phone books, saved user names and passwords, documents and browsing history;

    i. Notes: all bank records, credit information, account information or other financial information and records;

    j. Travel information: information recording travel arrangements during the time period set forth in the Affidavit regarding the defendant's travel and until the present;

    k. Internet: records of Internet Protocol addresses used, and any records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

    l. Records pertaining to financial transactions derived from the drug-trafficking activity.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.